Filed 2/26/26  P. v. Salomon CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE

**COURT OF APPEAL OF THE STATE OF CALIFORNIA**

IN AND FOR THE

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REGLA MARIA SALOMON,<br><br>    Defendant and Appellant. | F089180<br><br>(Super. Ct. No. MCR047041)<br><br><br>**MODIFICATION OF OPINION**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

On the court's own motion, it is ordered that the following modification be made to the opinion filed herein on February 19, 2026:

1.  Delete the text, "Mitchell C. Rigby, Judge. (Retired judge of the Madera County Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)" from the caption and replace it with the following text:  "Katherine M. Rigby, Judge."

There is no change in the judgment.

DETJEN, A.P.J.

WE CONCUR:

MEEHAN, J.

HARRELL, J.

Filed 2/19/26  P. v. Salomon CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>REGLA MARIA SALOMON,<br><br>  Defendant and Appellant. | F089180<br><br>(Super. Ct. No. MCR047041)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from an order of the Superior Court of Madera County.  Mitchell C. Rigby, Judge.  (Retired judge of the Madera County Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Linda J. Zachritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Detjen, Acting P. J., Meehan, J. and Harrell, J.

Appellant Regla Maria Salomon, through counsel, filed a *Wende*[1] brief on appeal after the trial court denied her petition to restore sanity under Penal Code section 1026.2.[2] Appellant did not file a supplemental brief on her own behalf. We find no arguable issues and affirm.

## BACKGROUND

In an information filed on November 8, 2013, the Madera County District Attorney charged appellant with assault with a deadly weapon (§ 245, subd.(a)(1)), with a great bodily injury enhancement (§ 12022.7, subd.(a)). Appellant pleaded not guilty and not guilty by reason of insanity and waived a jury trial. The trial court found her guilty of assault with a deadly weapon and found the great bodily injury enhancement true. At the sanity phase, the court found that appellant was "insane" at the time of the offense. On December 4, 2013, the court ordered her committed to a state hospital pursuant to section 1026, subdivision (a).

On August 31, 2023, appellant filed a petition to restore her sanity pursuant to section 1026.2. A court trial was held between September and November 2024. On November 25, 2024, the trial court denied appellant's petition. Appellant filed a notice of appeal challenging the court's ruling, and her counsel filed a *Wende* brief on appeal.

## FACTS

*Malia Sherman*

Forensic psychologist Malia Sherman had practiced as a psychologist for 14 years. Sherman evaluated appellant's mental status over Zoom for about one hour. That was the sole conversation Sherman had with appellant.

---

[1] *People v. Wende* (1979) 25 Cal.3d 436.

[2] Subsequent statutory references are to this Code.

Appellant told Sherman that, at the time of the offense, she was being influenced by auditory hallucinations and had a higher level of impulsivity. Sherman was unable to verify these claims in appellant's records.

Appellant also reported that, in the past, she was not always compliant with her treatment or medication. She would sometimes run into the street either due to auditory hallucinations or delusional thoughts.

Appellant said she now understood the importance of taking her medicine, the consequences of not taking the medicine, and had a realistic plan to continue taking her medicine.

Appellant began using methamphetamine and marijuana at age 13. Appellant's plan to avoid substance abuse was to continue taking her prescribed psychotropic medication. Appellant was able to describe the "perceived dangers" of drug use.

Sherman read a report from one of appellant's clinicians indicating she had shown significant improvement, especially with regards to her "insight" and compliance with medication requirements. Appellant described de-escalation techniques, including: "stepping away, taking deep breaths, using visualization and grounding techniques."

Appellant told Sherman about her anticipated family support when she leaves the state hospital.

During Sherman's interview of appellant, her speech was organized, which indicated she was not in active psychosis. Appellant's speech was also not "pressured," meaning not loud and rapid.

In preparation for the evaluation, Sherman reviewed documents provided by the state hospital and by the trial court. Sherman learned that appellant had been on "CONREP"[3] for six years and then went "AWOL." Appellant relapsed on drugs at that

---

[3] Presumably, a "community release program." (See, e.g., *People v. Bowers* (2009) 169 Cal.App.4th 1442, 1444.)

time.  However, after speaking with appellant, Sherman did not believe she would repeat that behavior.  Sherman believed appellant had since learned how to advocate for her needs in a healthy way due to her time in the state hospital.

After appellant was returned to custody, she assaulted a peer with a meal tray. Appellant said the assault was due to the peer "not respecting my personal space." Sherman later clarified that she did not speak with appellant about the incident and instead learned of it through mental health records at the Madera County jail.

In Sherman's opinion, appellant was not a danger to herself or others.  However, Sherman did not know whether she asked appellant about the underlying offense, and while appellant did "mention" the offense, they did not discuss it in any detail.  Appellant did say she was suffering from paranoid thoughts at the time and believed the victim had wanted to hurt her.

Sherman reviewed a report from the state hospital dated May 23, 2023, conveying the hospital's position that appellant should remain at the hospital.

On cross-examination, Sherman observed that structured professional judgments are those based on peer-reviewed tools and assessments, while unstructured professional judgments are based on interview and opinion.  Sherman acknowledged that her opinion in the case was not based on peer-reviewed tools and assessments.  Sherman said she was aware that the American Psychological Association filed an amicus brief in 2011 in a U.S. Supreme Court case, but was unaware the brief indicated that unstructured clinical judgment is "below the standard of practice in the field of violence risk assessment." Sherman said that some of the structured assessments are not reliable.

*Appellant's Testimony*

Appellant testified she was diagnosed with schizophrenia when she was 12 years old.  She testified that it was important for her to take her medications because they keep her "balanced" and in "better condition."  Stopping the medication would make her mentally unstable.

4.

Appellant testified that, if released, her plan was to continue treatment in outpatient status.

During appellant's time with CONREP, she had to move houses due to issues with her roommate. However, she eventually had to move back to the house with the problematic roommate. According to appellant, the roommate would walk in and out of the back door for several hours into the morning. The roommate also ran the washer and dryer at 2:00 a.m. or 3:00 a.m., which caused appellant to have anxiety and "panic." Appellant was paranoid because she could not sit still in the middle of the night knowing her roommate would "burst through" the back door. Appellant's clinician did not believe her and concluded appellant was falling into her old habits. Appellant decided to go AWOL. Appellant testified that leaving without permission was not the right thing to do. Appellant admitted to using methamphetamine while AWOL.

Appellant has since learned to enroll herself into drug programs and work the steps with a sponsor.

Appellant denied hitting anyone with a food tray, claiming instead that she was the victim of the attack.

At some point during her time in the state hospital, appellant became frustrated with her mother because she refused to write a hardship letter to allow appellant to transfer hospitals. Appellant became angry and did not speak to her mother for about a week. The relationship has since been repaired.

Appellant denied ever failing to take her medication and she believed any records indicating the contrary would be erroneous.

*Nathan Turner's Testimony*

Nathan Turner was a staff psychologist for the Stage Department of State Hospitals. Turner was appellant's treating psychologist. On August 7, Turner met with appellant, along with appellant's psychiatrist, social worker and rehabilitation therapist. During that meeting, appellant indicated that she eventually wanted to slowly stop taking

5.

medications altogether. Appellant said she had received treatment for 13 years and felt she could do it without medication treatment. This caused Turner to question how much insight appellant had truly developed into her need for medication. While appellant claimed she wanted to reduce medication under the supervision of psychiatric care, Turner did not believe appellant.

Appellant later asked if her statements regarding the cessation of medication would be problematic, and Turner responded affirmatively. Appellant then claimed she never made the statements at issue, even though her entire treatment team had heard them.

When asked how appellant had done with her programs at the state hospital, Turner testified her results had been "mixed." On the one hand, appellant had success attending individual therapy sessions from January to May.[4] She also had "adequate" attendance at a violence relapse prevention planning group run by Turner. However, starting in April and "escalating into May and further into June and July," appellant began having more frequent stress-related conflict with Turner and other members of the team. For example, in May, appellant interrupted a conversation Turner was having with another patient to insist that he speak with her that day. Turner told her he would try to meet with her, but it might not be the same day. Turner told appellant this was not the proper way to approach him and that he would be finishing his conversation with the other patient. Turner advised her to contact other staff if she had an urgent issue. As Turner walked down the hallway, appellant yelled loudly, " 'Hello?' " Turner observed significant emotional dysregulation during the encounter.

In July, appellant headed to leave the cafeteria without permission rather than wait for proper approval. Appellant did relent. However, she asked for hospital police to be contacted so she could tell her side of the story.

---

[4] Presumably in the year 2024.

6.

In late July, appellant had an issue with a roommate. Appellant was watching a DVD and was speaking to herself using profanity. Her roommate thought appellant was talking to her and a confrontation ensued. Appellant said, " 'If I was going to call you that I would say it to your face.' " Appellant also told her roommate to be quiet and used profanity in doing so. Appellant eventually left the room.

Appellant told the providers of her substance abuse recovery program that she would be terminating her participation in order to pursue the present sanity petition in the trial court. Appellant's treatment team advised her that it was not appropriate for her to terminate participation without collaborating with her treatment team.

*Mario Souza's Testimony*

Mario Souza was a senior psychologist with the "Forensic Evaluation Department," where his role is to conduct long-term evaluations of patients under sections 1026 and 2962.

Souza opined that Sherman's forensic process would not be generally accepted in the scientific field because it lacked any structure.

Souza observed that in her trial testimony, appellant failed to recount that her conflict with roommates during CONREP was in part based on her delusional belief that they were using witchcraft to harm her and had assaulted her in her sleep. When appellant's treatment team told her that these concerns were not based in reality, she became confrontational and then disconnected from them.

Souza testified that a month prior to going AWOL, appellant had begun "saving" her medications. Consequently, her claim that she has always been medicine compliant was incorrect. Additionally, this was the period of time when appellant began verbalizing more paranoid delusional beliefs.

Souza said appellant also refused some of her medications in 2023 at the state hospital.

Souza offered his opinion, based on the "HCR-20" violence risk assessment tool, that appellant's violence risk was currently best managed within the state hospital system.

Souza acknowledged there was no indication appellant had been violent with anyone during her six years on CONREP, nor from 2022–2024. Souza also admitted that appellant has improved her insight into her mental illness compared to 2022.

*Trial Court Ruling*

After the close of evidence, the People objected to Sherman's testimony as lacking foundation because it was based on unstructured analysis. After taking the evidence and argument of counsel under submission, the trial court made its rulings. The court declined to exclude Sherman's testimony, saying the issues raised by the People went to weight, not admissibility. Ultimately, the court accorded more weight to the testimony of the People's experts than appellant's expert, and denied the petition due to appellant's failure to carry her burden of proof.

## DISCUSSION

After independent review of the record, we have concluded there are no reasonably arguable legal or factual issues.

## DISPOSITION

The order denying appellant's petition to restore sanity is affirmed.

8.